UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-4775(DSD/SRN)

Kristian O. Hansen,

     Plaintiff,

v.                                                           ORDER

Mannheim Services Corp., d/b/a
Minneapolis Auto Auction,

     Defendant.

    Michael C. Hager, Esq., Hager Law Office, 301 Fourth
    Avenue South, Suite 270, Minneapolis, MN 55415, counsel
    for plaintiff.

    Joshua A. Hasko, Esq., Tina Syring-Petrocchi, Esq. and
    Rider Bennett, LLP, 33 South Sixth Street, Suite 4900,
    Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon defendant's motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion in part.

**BACKGROUND**

This is an action under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54. Plaintiff Kristian O. Hansen was an employee of defendant Mannheim Services Corporation ("Mannheim") from February 12, 1997, to November 15, 2002. Mannheim is an auto auction that does business as Minneapolis Auto Auction ("MAA").

Mannheim employed Hansen as an at-will employee who could be terminated "at any time, for any reason, without prior notice." (Hasko Aff. Ex. C.)  After being hired, Hansen received a copy of the MAA Employee Policy Handbook ("Handbook").  A violation of any of the Handbook's policies constitutes grounds for disciplinary action.  Throughout his employment at Mannheim, Hansen progressed through numerous positions, including lot employee, condition report writer, vehicle check-in supervisor, assistant lot operations manager and assistant fleet manager.  While an assistant lot operations manager, Hansen oversaw security for a period of approximately six months.

Prior to 2002, Hansen's personnel file contained two documented concerns regarding Hansen's work performance, although only one was in the form of a written disciplinary action.  (See Hasko Aff. Ex. B.)  On April 10, 1997, Jim Kreitlow, Hansen's supervisor, documented Hansen's repeated errors, poor handwriting, tardiness, high mistake level and need for improvement.  Kreitlow verbally discussed these concerns and potential disciplinary action with Hansen.  On May 6, 1997, Hansen received his first written disciplinary action warning notice due to his tardiness.  (See id.)  In addition to the documented incidents, while a vehicle check-in supervisor, Hansen crashed a motorcycle into a pole.  (Hansen Dep. at 68.)  Hansen informed MAA security about the accident but did not inform his immediate supervisor.  (Id. at 68-69)  Hansen was

not required to submit to drug and alcohol testing following the accident. (Id.)

In March of 2001, Hansen began to experience lower back pain. Following an initial consultation with his general practitioner, Dr. Boehm, Hansen was prescribed physical therapy for six weeks and thereafter attended physical therapy two times a week. Mike Hinkelmeyer, his supervisor at the time, gave Hansen permission to arrive to work late to accommodate the physical therapy sessions. In October of 2001, following a review of an MRI, Hansen was diagnosed with two degenerated and herniated discs. (Hager Aff. Ex. 1 at PNC 92.) Hansen was referred to a spine specialist, Dr. Daniel Kurtti, who recommended spinal injection treatments.

On the morning of Friday, October 26, 2001, Hansen received his first spinal injection treatment by Dr. Ramon Sotto, a surgeon, and did not attend work the remainder of the day. (See Hager Aff. Ex. 1 at PNC 70.) On Wednesday, October 31, 2001, Hansen began to lose feeling in his legs and feet while at work. A co-worker gave Hansen a ride to a clinic where an urgent care doctor, Dr. James Bergan, consulted with Dr. Kurtti and informed Hansen that he was suffering from a reaction to the spinal injections. (Id. at PNC 79.) Dr. Bergan provided Mannheim with a note on Hansen's behalf excusing him from work until November 2, 2001. (Hasko Supp. Aff. Ex. A.) On December 21, 2001, Hansen received a second spinal injection treatment by Dr. Sotto. (See Hager Aff. Ex. 1 at PNC

69.) Hansen did not suffer an adverse reaction to the second treatment.

The first two spinal injection treatments ultimately proved ineffective. On February 11, 2002, Hansen visited a neurosurgeon, Dr. Mark Larkins, and was informed that neurosurgery was not a plausible solution. (See id. at PNC 76.) Hansen continued to suffer severe lower back pain that resulted in difficulty moving while at work. Throughout the remainder of February, 2002, Hansen missed seven days of work over a two-week period due to his unresolved lower back condition. On March 8, 2002, Hansen visited a bone surgeon, Dr. Ensor Transfeldt, who also recommended against surgery. (See id. at PNC 89.) Dr. Transfeldt, however, prescribed Vioxx to Hansen which enabled him to resume normal work activities free of pain.

On April 16, 2002, Hansen received his second written disciplinary action warning notice, which he refused to sign. (Hasko Aff. Ex. B.) This warning specifically addressed a violation of the Handbook's hours and attendance policy by Hansen's failure to inform his manager that he would be late for work on April 9, 2002. The warning further informed Hansen that as of April 16, 2002, he had used up all of his sick days for the year. The warning specified that "any re-occurrence may result in disciplinary action, up to and including possible termination." (Id.) On June 13, 2002, Hansen received his third written

4

disciplinary action warning notice for failing to provide his supervisor with a complete off-line report. (Id.)

Throughout the summer of 2002, Hansen's back condition gradually improved under the supervision of Dr. Kurtti. His reliance on Vioxx decreased and he began a three-month course of pool therapy. Tony Manwarren, Hansen's supervisor, was aware of the pool therapy sessions and allowed Hansen to arrive late to work four days a week to accommodate morning therapy. As a result of Hansen's increased strength, Dr. Kurtti recommended additional spinal injections in preparation for a more aggressive rehabilitation plan.

On Friday, November 8, 2002, Hansen received his third spinal injection treatment. On Wednesday, November 13, 2002, at approximately 9:00 a.m. Hansen was involved in an automobile accident while at work. Hansen promptly informed security of the accident. Hansen did not inform his supervisor or a manager that he had been involved in an automobile accident and he was not asked, nor did he take, a drug and alcohol test following the accident. Around 12:30 p.m., Hansen began to lose feeling in his lower extremities. Hansen asked two other Mannheim employees to inform his supervisor, Manwarren, that he was going to call his physician. Hansen called Dr. Kurtti from work and was informed

5

that he was having an adverse reaction to the spinal injections. Hansen did not personally inform his supervisor of this conversation or his need to leave work prior to leaving.

After he spoke with Dr. Kurtti, Hansen left work in an attempt to drive himself home before the loss of sensation prevented him from driving. However, he was unable to do so. Hansen stopped at a nearby relative's house until his wife arrived to drive him the remainder of the way home. At approximately 2:30 p.m., Hansen telephoned Manwarren. That telephone conversation was very brief and Hansen did not inform Manwarren about the accident because allegedly Manwarren was busy and hung up on him. (Hansen Dep. at 119.) Following his conversation with Manwarren, Hansen called an office employee and informed her that he was at home and that his physician would be faxing a note. Dr. Kurtti faxed a note to Mannheim excusing Hansen from work the remainder of November 13. (Hasko Aff. Ex. B.)

The following day, November 14, Hansen decided his condition had not improved enough to return to work. Prior to 7:00 a.m., Hansen left a voicemail for Manwarren that he would not be coming to work. Hansen did not personally speak to Manwarren or any other person at Mannheim on November 14. On November 15, 2002, Hansen arrived at work following his morning pool therapy session and was promptly provided a written disciplinary action notice of termination, which he refused to sign. The termination notice

6

cited Hansen's failure to follow directions on November 11 and 12, failure to report an automobile accident to his supervisor on November 13, failure to be available for a physical examination following an automobile accident on November 13, failure to notify his supervisor prior to leaving work early on November 13, and failure to personally notify his supervisor regarding his absence from work on November 14.  (Id.)

Following his termination, Hansen brought this action claiming that Mannheim violated the FMLA by interfering with his FMLA rights and terminating him in retaliation for exercising his FMLA rights. Mannheim denies Hansen's allegations and now moves for summary judgment.

### DISCUSSION

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v.

7

Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. See id. at 255. The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**II.  The Family Medical Leave Act**

Under the FMLA, an employee is entitled to twelve weeks of unpaid leave during any twelve-month period if that person has a "serious health condition that makes the employee unable to perform the functions" of their employment position. 29 U.S.C. § 2612(a)(1)(D). A serious health condition includes an "illness, injury, impairment, or physical or mental condition that involves ... continuing treatment by a health care provider." Id.

§ 2611(11)(B). The term "serious health condition" is to be construed broadly. <u>Stekloff v. St. John's Mercy Health Sys.</u>, 218 F.3d 858, 862 (8th Cir. 2000).

The court applies an objective test to determine whether a plaintiff suffered a serious health condition for purposes of the FMLA. <u>Rankin v. Seagate Techs., Inc.</u>, 246 F.3d 1145, 1148 (8th Cir. 2001); <u>Thorson v. Gemini, Inc.</u>, 205 F.3d 370, 376 (8th Cir. 2000). To meet the objective test, a plaintiff must establish that as a result of his health condition (1) he had a period of incapacity that required absence from work, (2) the period of incapacity exceeded three consecutive days and (3) following the period of incapacity he was treated by a health care provider. <u>Rankin</u>, 246 F.3d at 1148; <u>Thorson</u>, 205 F.3d at 377. The subsequent treatment can occur either on two or more separate occasions or on one occasion that results in a supervised, continuing treatment regime. 29 C.F.R. § 825.114(a)(2)(i); <u>Rankin</u>, 246 F.3d at 1147.

Even if a serious health condition exists, a FMLA claim will not succeed when an employee fails to provide an employer adequate and timely notice of his need for leave. <u>Woods v. DaimlerChrysler Corp.</u>, 409 F.3d 984, 991 (8th Cir. 2005). When the need for FMLA leave is foreseeable based on planned medical treatment, the employee must "provide the employer with not less than 30 days' notice, before the date the leave is to begin." 29 U.S.C. § 2612(e)(2)(B). If treatment is required to occur in less than

9

thirty days, the employee is required to provide "such notice as is practicable" under the circumstances. Id.; 29 C.F.R. § 825.303(a). In the event of a medical emergency, an employee may not be required to give "written advance notice pursuant to an employer's internal rules and procedures." 29 C.F.R. § 825.303(a).

In providing timely notice, an employee is not required to "invoke the FMLA by name" to put an employer on notice that the FMLA is relevant to the absence. Thorson, 205 F.3d at 381; see also Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 852 (8th Cir. 2002). Rather, an employee is required only to provide sufficient information that the health condition could be serious. Woods, 409 F.3d at 990. In evaluating whether sufficient notice was given, the court can consider whether an employer was previously made aware that the employee suffered from a serious health condition and whether the employee had previously needed FMLA leave. See Spangler, 278 F.3d at 852 (statement that time off was needed due to "depression again" was a valid request for FMLA leave where company was aware that employee suffered from depression and previously needed leave). Once an employee has provided notice, the employer is then obligated to either provide FMLA leave or to verify that the request is valid by following the statutory and regulatory certification procedures. Spangler, 278 F.3d at 852; Thorson, 205 F.3d at 381.

**A.   Entitlement to FMLA Leave**

Hansen claims that he was entitled to FMLA leave for November 13 and 14, 2002. Mannheim argues that Hansen was not entitled to FMLA leave because Hansen did not suffer a serious health condition.[1] However, the record is replete with evidence to the contrary. Hansen first began to suffer from lower back pain in March of 2001, and was thereafter diagnosed as suffering from two degenerated and herniated discs. In February of 2002, Hansen was twice absent from work due to his back condition, once for three consecutive days and once for four consecutive days. From March of 2001 until November 15, 2002, Hansen underwent repeated physical therapy sessions, three rounds of spinal injection treatments, two surgical consults and multiple appointments with both a general practitioner and a spine specialist. Based on the foregoing, the court concludes that Hansen suffered a physical impairment that resulted in a period of incapacity of more than three consecutive

---

[1]   Mannheim argues, based on the applicable statute of limitations, that the court may not consider any medical treatment Hansen received prior to November, 2002, in evaluating whether he suffered from a serious health condition. Pursuant to 29 U.S.C. § 2617, a FMLA action is time-barred if brought later than "2 years after the date of the last event constituting the alleged violation for which the action is brought." The statute of limitations does not restrict the court's review of prior medical treatment in evaluating whether a serious health condition existed at the time an actionable violation allegedly occurred. Therefore, the court rejects Mannheim's statute of limitations argument.

11

days and involved subsequent, continuing treatment.[2]  See 29 U.S.C. § 2611(11)(B); 29 C.F.R. § 825.114(a)(2); see also S. Rep. No. 103-3, at 29 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 31 ("back conditions requiring extensive therapy or surgical procedures" are serious health conditions).  Therefore, Hansen had a serious health condition for purposes of the FMLA.

Mannheim also argues that Hansen was not entitled to FMLA leave on November 13 and 14, 2002, due to his failure to provide Mannheim adequate and timely notice of his need for the leave.  As of November 13, 2002, Mannheim had been aware of Hansen's ongoing medical treatment since 2001.  Mannheim had received multiple physicians' notes relating to Hansen's physical therapy and doctor appointments.  Hansen's supervisors allowed him to adjust his work schedule in order to accommodate physical therapy.  Mannheim was also aware that Hansen had suffered a similar adverse reaction on October 31, 2001, following his first spinal injection treatment. (See Hasko Supp. Aff. Ex. A.)  The record is not clear whether Mannheim was specifically on notice that Hansen received the third spinal injection treatment on November 8, 2002.

---

[2]  Even if Hansen had not established a period of incapacity greater than three consecutive days, he would meet the definition of a "chronic serious health condition," which is defined as a condition that continues over an extended period of time, requires periodic visits for treatment and causes episodic periods of incapacity.  See 29 C.F.R. § 825.114(a)(2)(iii).

12

Although Hansen had previously received two spinal injection treatments, he only suffered an adverse reaction to one of those treatments. Therefore, it was not necessarily foreseeable that Hansen would suffer an adverse reaction to the November 8 treatment. On November 13, once Hansen began to lose sensation in his lower extremities, he asked two co-workers to inform Manwarren of the situation and that Hansen was going to call his physician. Dr. Kurtti advised Hansen to refrain from working the remainder of the afternoon. He then left work in an attempt to drive home before he lost further sensation in his legs. Hansen called Manwarren once he arrived home. Dr. Kurtti faxed a note to Mannheim that afternoon and Hansen verified that the fax was received. On November 14, Hansen called Manwarren prior to 7:00 a.m. regarding his inability to return to work. Mannheim did not request additional documentation or a physician's note for the November 14 absence. Under these circumstances, the court finds that Hansen gave sufficient notice to Mannheim for FMLA purposes and was entitled to FMLA leave. Therefore, summary judgment is not warranted on the grounds that Hansen was not entitled to FMLA leave.

**B.   Interference Claim**

Hansen claims that Mannheim interfered with his right to FMLA leave. The FMLA prohibits employers from interfering with, restraining or denying the exercise of an employee's FMLA rights.

13

See 29 U.S.C. 2615(a)(1); Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 977 (8th Cir. 2005). Examples of an employer's interference of an employee's right to FMLA leave include refusing to authorize leave, discouraging leave or avoiding FMLA responsibilities. See 29 C.F.R. § 825.220(b). However, an employer is not liable for employment decisions that are not grounded on an employee's right to FMLA leave. Throneberry, 403 F.3d at 977; Bailey v. Armsted Indus. Inc., 172 F.3d 1041, 1045-46 (8th Cir. 1999). Hansen has failed to set forth how Mannheim interfered with, restrained or denied his right to FMLA leave.[3] To the contrary, the record establishes that Mannheim consistently allowed Hansen to take leave for his routine physical therapy sessions and doctor appointments without any repercussion. Further, as to November 13 and 14, 2002, Mannheim did not have an opportunity to interfere, restrain or deny Hansen's right to FMLA leave due to the rapid onset of his adverse reaction. Therefore, summary judgment is appropriate on plaintiff's unlawful interference claim.

**C. Retaliation Claim**

Hansen claims that Mannheim terminated his employment in retaliation against him for exercising his right to FMLA leave on

---

[3] To the extent Hansen argues he was terminated for violations of company policy that resulted from his need for medical leave, the court addresses that argument in relation to Hansen's retaliation claim.

14

November 13 and 14, 2002. An employer cannot retaliate against an employee who exercises his FMLA rights through an adverse employment action. McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002); Darby v. Bratch, 287 F.3d 673, 678 (8th Cir. 2002). For a FMLA retaliation claim to survive a motion for summary judgment, a plaintiff must establish a prima facie showing of wrongful retaliation. McBurney, 398 F.3d at 1002-03. To establish a prima facie claim, plaintiff must show that (1) he engaged in conduct protected under the Act, (2) he suffered an adverse employment action and (3) there is a causal connection between the two. Id.

Once a plaintiff has made a prima facie showing of FMLA retaliation, the court applies a variant of the familiar "shifting burdens" analysis set forth in McDonnell Douglas. See Smith, 302 F.3d at 832 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). If a prima facie claim is established, the defendant has the burden to offer a legitimate, non-retaliatory reason for the adverse action. See id. at 833. The plaintiff must then rebut the defendant's justification by presenting evidence that the proffered reason is pretext. See id. Summary judgment is inappropriate if the plaintiff presents such evidence and creates a reasonable inference of retaliation. See id.

15

The first two elements of Hansen's prima facie claim are established because the court has determined Hansen was entitled to FMLA leave and discharge from employment constitutes an adverse employment action. See Smith, 302 F.3d at 832. As to the third element, causation, Hansen points to his immediate termination upon return to work on November 15, 2002. The time lapse between the protected activity and the adverse employment action is an important factor in determining whether a causal connection exists. McBurney, 398 F.3d at 1003. In certain cases, temporal proximity alone can be sufficient to create an inference of retaliation. Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005); Smith, 302 F.3d at 832-33. However, where temporal proximity is the only evidence of a causal connection, such proximity "must be very close." Smith, 302 F.3d at 832-33. Hansen was fired the morning he returned to work. The court finds that the interval between the exercise of his right to FMLA leave and the adverse employment action is sufficient to establish a causal connection. Therefore, Hansen has met his prima facie burden to establish a retaliation claim.

Because Hansen established a prima facie retaliation claim, Mannheim must offer a legitimate, nondiscriminatory reason for its actions. See Smith, 302 F.3d at 833. Mannheim alleges that it discharged Hansen for multiple violations of company policy. An employee's violation of employment policies can be a legitimate,

non-retaliatory justification for termination. See Grey v. City of Oak Grove, Mo., 396 F.3d 1031, 1035 (8th Cir. 2005) (violation of city personnel and police department policies). Hansen's termination notice cited his failure to follow directions on November 11 and 12, his failure to inform his supervisor that he was involved in an accident on November 13, his failure to be available for a drug and alcohol test on November 13 and his failure to properly notify his supervisor of his absence from work on November 13 and 14. (See Hasko Aff. Ex. B.)

To the extent Hansen's alleged violations of company policy were a direct result of his need to leave work due to his back condition, the court finds that those violations cannot justify his termination. See 29 C.F.R. § 825.220(c); Thorson v. Gemini, Inc., 205 F.3d 370, 375 (8th Cir. 2000) (an employee's FMLA absence cannot be used as a negative factor in employment actions). However, Hansen's failure to follow directions on November 11 and 12, his failure to inform his supervisor that he was involved in an accident on November 13 and his failure to be available for a drug and alcohol test are all grounds for disciplinary action independent of Hansen's right to FMLA leave. Coupled with Hansen's three previous written disciplinary action warnings, the court finds that these violations of company policy establish a legitimate, non-retaliatory justification for Hansen's discharge.

When the defendant has come forward with a valid reason for its actions, the burden returns to plaintiff to present evidence that (1) creates a question of fact as to whether the proffered reason is pretext and (2) creates a reasonable inference of retaliation. Smith, 302 F.3d at 833. Strong evidence of a prima facie retaliation claim may also be used to establish pretext, in this case, temporal proximity. See id. at 834. A plaintiff may also prove pretext by establishing that the proffered reason has no factual basis. Id.

Hansen asserts multiple arguments to create a question of fact as to whether Mannheim's proffered reasons are pretext.[4] First, the temporal proximity between Hansen's right to FMLA leave and the adverse employment action supports an inference of retaliation. Second, Hansen argues that he did not in fact violate company policy. As to his failure to report the November 13 accident to his supervisor, the Handbook does not specify to whom an employee must report an accident. (See Hasko Aff. Ex. C.) Hansen immediately reported the accident to Mannheim security. Mannheim argues that Hansen should have reported the accident to his supervisor, Manwarren. However, Hansen had previously been involved in an automobile accident at work and was not disciplined for reporting that accident to security.

---

[4] On September 23, 2005, the court denied as untimely plaintiff's motion to augment the record regarding his explanation as to the events of November 11 and 12, 2002.

As to his failure to be available for a physical examination, the Handbook does not require that an employee submit to drug and alcohol testing following any accident.  (See id.)  Rather, the Handbook states, in relevant part:

> When there is reasonable cause to believe that an employee's physical or mental abilities may be impaired during working time as the result of alcohol or drug use, the Auction may require the employee to have a physical examination, which may include drug or alcohol testing.  A refusal by an employee to attend such a physical examination within the time requested by the employee's supervisor or a refusal to cooperate in any way with the examination, including any alcohol or drug testing will result in disciplinary action, up to and including termination.

(Id.)  Mannheim argues that Hansen was aware of the company's policy that every employee involved in an accident is required to submit to a physical examination.  However, Hansen had not been requested to submit to a physical examination following his involvement in a prior motor vehicle accident at work.  Hansen argues that he was not requested to submit to a physical examination throughout the morning of November 13 and that there would have been no reasonable cause to support such a request. Hansen further argues that his failure to volunteer for a physical examination that was not requested does not violate company policy.

Lastly, as to his failure to personally report his November 14 absence, the Handbook states, in relevant part:

> If circumstances prevent you from knowing you will be late, you must notify your supervisor

19

>     as soon as possible prior to your scheduled
>     start time.  All absences from work must be
>     reported personally by you.

(Id.)  Mannheim argues that Hansen should have called during business hours on November 14 to report his absence.  Hansen argues that calling and leaving a voicemail for Manwarren prior to 7:00 a.m. to inform him of his absence is not a violation of company policy.  Based on the record, the court finds that Hansen has created an issue of fact as to whether the reasons cited by Mannheim in the November 15, 2002, termination notice were pretext.  Therefore, summary judgment in favor of Mannheim is not appropriate on Hansen's retaliation claim.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 19] is granted as to plaintiff's interference claim and denied as to plaintiff's retaliation claim.

Dated:  January 9, 2006

                                    s/David S. Doty
                                    David S. Doty, Judge
                                    United States District Court